IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOTAI SAIB,<br>　　*et al.*,<br><br>　　　　Petitioners,<br><br>v.<br><br>GEORGE W. BUSH,<br>　　President of the United States,<br>　　*et al.*,<br><br>　　　　Respondents. | Civil Action No. 05-CV-1353 (RMC) |

**PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION TO STAY PROCEEDINGS PENDING RELATED APPEALS AND FOR CONTINUED COORDINATION**

Petitioner Motai Saib, through his counsel, Holland & Hart LLP, respectfully submits this Opposition to Respondents' Motion to Stay Proceedings Pending Related Appeals and for Continued Coordination. Petitioner opposes the stay requested by Respondents, but does not oppose entry of the protective orders detailed in the Minute Order dated August 1, 2005.

**ARGUMENT**

I. **Petitioners' Claims Under The Military Order Are Not Addressed In The Pending Appeals.**

Respondents argue that this case should be stayed because they allege that all of the issues raised in the Petition are "squarely addressed" in appeals currently pending before the D.C. Circuit Court of Appeals. Respondents' Motion at 1. In particular, the Motion to Stay relies on orders issued by Judge Leon dismissing claims in Khalid v. Bush, No. 04-CV-1142 (RJL), and Boumediene v. Bush, No. 04-CV-1166 (RJL), 355 F.

1

Supp.2d 311 (D.D.C. 2005); and an order issued by Judge Green denying in part and granting in part the government's motion to dismiss claims in <u>In re Guantanamo Detainee Cases</u>, No. 02-CV-0299, <u>et. al</u>, 355 F. Supp.2d (D.D.C. 2005). Each of these orders is on appeal currently pending before the D.C. Circuit. Contrary to Respondents' position, however, the Petition for Writ of Habeas Corpus filed July 7, 2005 in this case ("Petition") raises crucial issues that are not addressed in the pending appeals.

First, the Petition asserts a number of claims based on the Military Order of November 13, 2001, "Detention of Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism," 66 Fed. Reg. 57,833 ("Military Order"). Among other things, the Military Order requires that "[a]ny individual subject to this order shall be ... (b) treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria ...." Military Order § 3(b). The Petition alleges that Petitioner's detention is in violation of the Military Order. None of the appellate proceedings upon which Respondents base their Motion to Stay involves claims based on Respondents' failure to abide by the terms of the Military Order. While the petitioners in *Khalid v. Bush* challenged the government's authority to issue the Military Order, 355 F.Supp. 2d. 311, 316 (D.D.C. 2005), they did not allege that the government is failing to comply with the Military Order. These issues have not been subject to discovery or briefing. Accordingly, it is inappropriate to stay Petitioner's pursuit of these claims.

Second, Petitioner has asserted claims under H.R. 1268, "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005," Public Law No: 109-13 ("PL 109-13"). PL 109-13 includes Section

1031, entitled: "Prohibition on Torture and Cruel, Inhuman, or Degrading Treatment." Petitioner alleges that Petitioner's detention is also in violation of PL 109-13. Again, none of the appellate proceedings upon which Respondents base their Motion to Stay involves claims under PL 109-13.

Respondents argue that the stay should be granted because a stay would promote judicial efficiency. But a stay will not save judicial time and resources because these claims will have to be addressed regardless of the outcome of the pending appeals. Because Petitioner asserts claims that are not addressed in the pending appeals, this Court should deny Respondents' Motion to Stay Proceedings.[1]

## II. Respondents' Assertion That Petitioner Is Not Being Held Pursuant To The Military Order Does Not Support Their Motion To Stay.

At the hearing on November 28, 2005 on Petitioner's Motion to Vacate the Minute Order Staying Proceedings, Respondents claimed that Petitioner is not being detained pursuant to the Military Order, but is rather being detained under the general authority of the President as Commander-in-Chief. This contention is clearly at odds with the findings in *Khalid*,[2] and had not been asserted in this case prior to the hearing. Respondents have presented no evidence in support of their assertion, but have made only an unsupported allegation that Petitioner's detention is not based on the Military Order. Subsequent to the hearing, Petitioner's counsel inquired of counsel for

---

[1] If necessary, Petitioner's claims based on the Military Order and PL 109-13 can be carved out and bifurcated from other claims in the Petition, and the carved out claims can be pursued while the other claims are stayed pending the outcome of the cases on appeal.

[2] "Pursuant to this order [Military Order of Nov. 13, 2001], the United States has targeted and captured, to-date, a large number of foreign nationals both on and off the battlefields of Afghanistan and transported them for detention to Guantanamo Bay, Cuba." 355. F.Supp 2d at 315.

Respondents concerning the basis for the assertion and requested any documentation available describing the process by which certain detainees are "designated" or not pursuant to the Military Order. *See* email message dated Nov. 30, 2005 from Anne Castle to Preeya Noronha, attached hereto as Exhibit A. No response has been received. If the Court were to accept Respondents' assertion without evidentiary basis or allowing discovery on this issue, the Respondents could succeed in staying further proceedings on the Military Order allegations, but could subsequently alter course and invoke the authority of the Military Order to detain Petitioner when it suits their purpose.

The above described concern is not without basis. Respondents' strategy with respect to application of the Military Order in *Shafiiq v. Bush*, Case No. 05-CV-1506(RMC) also currently pending before this Court, demonstrates its validity. As in this case, Petitioners in *Shafiiq* opposed Respondents' motion to stay proceedings by arguing that the pending appeals did not challenge the government's compliance with the Military Order.[3] In response, Respondents claimed that Petitioner Shafiiq was not being detained pursuant to the Military Order.[4] Just two months later, however, Respondents changed their position, indicating that Shafiiq has been charged with

---

[3] *See Shafiiq v. Bush*, Case No. 05-CV-1506, Petitioners' Opposition to Respondents' Motion for Order to Show Cause or, in the Alternative, to Stay Proceedings and Request for Status Hearing, filed September 12, 2005, at 7.

[4] *See Shafiiq v. Bush*, Case No. 05-CV-1506, Respondents' Reply in Support of Motion for Order to Show Cause Why Case Should Not be Dismissed for Lack of Proper "Next Friend" Standing or, in the Alternative, to Stay Proceedings Pending Related Appeals, filed Sept. 22, 2005, at 12 n.14 ("Petitioners' detention as enemy combatants is not pursuant to that Order [Military Order], however; petitioners are detained pursuant to the President's general authority as Commander in Chief, the congressional Authorization for Use of Military Force, and the international law of war.").

4

offenses triable by military commission[5] and citing to an undated written charge that alleges that jurisdiction for the military commission is based on a Presidential determination dated July 6, 2004 that Shafiiq is subject to the Military Order (copy of charge is attached as Exhibit B).[6] Further inquiry into the authority for this Petitioner's detention and the basis for invoking the Military Order is necessary, or Respondents will be able to change their stance at whim in this case as they have in *Shafiiq v. Bush*, avoiding application of the Military Order when it suits their purpose, and relying on the Military Order when they so choose. This Court should deny Respondents' motion to stay proceedings and permit Petitioners to conduct discovery on this issue.

### III.    Respondents Should Be Required To File A Factual Return.

Regardless of whether the Court stays some or all of this case, Respondents should be required to submit a factual return to the Petition. Petitioner's counsel has a right to examine the return in order to develop Petitioner's case and to allow for meaningful consultation between Petitioner and his counsel. The protective order entered in this case, which Petitioners do not oppose, will fully protect against disclosure of classified information. Finally, Respondents cannot avoid their obligation to respond to a petition for writ of habeas corpus with generalized assertions regarding the administrative burdens they bear.

---

[5] *See Shafiiq v. Bush*, Case No. 05-CV-1506, Respondents' Response to Petitioners' Memoranda Showing Cause, filed Nov. 28, 2005, at 2 n.2 ("Respondents note that petitioner Shafiiq . . . has recently been charged with offenses triable by military commission . . . .")

[6] *See* Exhibit B at 1, Paragraph 1 ("Jurisdiction for this Military Commission is based on the President's determination of July 6, 2004 that Sufyian Barhoumi (a/k/a . . . Shafiq . . .) is subject to his Military Order of November 13, 2001.")

It is significant that Respondents have been specifically ordered to provide factual returns in seven other habeas cases pending in this Court, despite the fact that the cases had otherwise been stayed.[7] In fact, in *Zalita v. Bush*, one of the cases in which this consolidated motion to stay was filed, Judge Urbina ordered a factual return on similar grounds. *See* Case No. 05-CV-1220, Memorandum Order (D.D.C. July 25, 2005) ("the government's generic references to the expenditure of its resources and a 'logistical burden' [citation omitted] does not persuade the court to delay ordering the returns; the court is confident that the government can handle this task.")

## CONCLUSION

For the reasons stated above, Respondents' Motion to Stay Proceedings Pending Related Appeals and for Continued Coordination ought to be denied. Petitioners further request that the Court order that Respondents provide Petitioners with a factual return in response to the Petition within a reasonable time.

---

[7] *See, e.g., Kurnaz v. Bush*, 04-CV-01135 (ESH), 2005 WL 8329542, at *1 (D.D.C. Apr. 12, 2005) (stating that habeas counsel require access to the full factual returns now "to ensure that the proceedings can continue in an orderly fashion in the event that detainees prevail on appeal"); *Al-Adahi v. Bush*, 05-CV-00280 (GK), slip op. at 2 & n.1 (D.D.C. Apr. 29, 2005) (ordering production of factual returns so that petitioners' counsel "can begin preparing their defense well in advance of any ruling by the Court of Appeals"); *Al-Anazi v. Bush*, 05-CV-00345 (JBD), slip op. at 20 (D.D.C. Apr. 21, 2005) (ordering the U.S. Government to produce factual returns and noting that "the factual returns appear necessary for petitioners' counsel effectively to represent petitioners," and "even initial conversations by counsel with their clients may be very difficult without access to that basic factual information"); *see also Al-Shamri v. Bush*, 05-CV-00551 (RWR), slip op. at 4 (D.D.C. May 10, 2005) (staying proceedings but ordering the Government to produce factual returns); *El-Banna v. Bush*, 04-CV-01144 (RWR), slip op. at 7 (D.D.C. Apr. 8, 2005) (same); *Errachidi v. Bush*, No. 05-CV-00640 (EGS) (D.D.C. Apr. 21, 2005) (minute order) (same); *Zalita v. Bush*, No. 05-CV-1220 (RMU), slip op. at 2 (D.D.C. July 25, 2005).

Dated this 6th day of December, 2005

        Respectfully submitted,

        Counsel for Petitioners:

        /s Anne J. Castle
        Anne J. Castle (Colorado State Bar #11202)
        Scott S. Barker (Colorado State Bar #11177)
        J. Triplett Mackintosh (Colorado State Bar #22359)
        William E. Murane (Colorado State Bar # 2676)
        Douglas L. Abbott (Colorado State Bar #18683)
        Hamid M. Khan (Colorado State Bar #34139)
        Valerie L. Simons (Colorado State Bar #30218)
        Barry C. Bartel (Colorado State Bar #23040)
        Jonathan S. Bender (Colorado State Bar #33979)
        Nicole P. Livolsi (Colorado State Bar #36267)
        HOLLAND & HART LLP
        555 Seventeenth Street, Suite 3200
        Denver, CO 80202
        Telephone: (303) 295-8000

        Of Counsel
        Barbara J. Olshansky (New York State Bar #3635)
        CENTER FOR CONSTITUTIONAL RIGHTS
        666 Broadway
        New York, New York 10012
        Telephone: (212) 614-6439

## CERTIFICATE OF SERVICE

I certify that on December 6, 2005 I served a copy of the foregoing document to the following by

☐ U.S. Mail, postage prepaid
☐ Hand Delivery
☐ Fax
☒ Electronic Service

Preeya M. Noronha, Esq.
U.S. Department of Justice
20 Massachusetts Ave., NW
Room 7226
Washington, DC 20530
preeya.noronha@usdoj.gov

3483436_1.DOC

## Anne J. Castle

| | |
|---|---|
| **From:** | Anne J. Castle |
| **Sent:** | Wednesday, November 30, 2005 5:49 PM |
| **To:** | Preeya.Noronha@usdoj.gov |
| **Cc:** | Scott Barker; Trip Mackintosh; Rick Bailey; Mona Burton; Meghan Winokur |
| **Subject:** | designation of GTMO detainees subject to Military Order |

Preeya, I am writing to inquire about the position taken by the Respondents in the GTMO habeas corpus cases that Motai Saib and other detainees are not "designated" under the Nov. 13, 2001 order of the President ("Military Order"). You stated at the hearing on Monday, Nov. 28 that Motai Saib, Case No. 05-1353, is not so designated. With respect to others of our clients, specifically Nabil (Case No. 05-1504), Shafiiq (Case No. 05-1506), and al Hawary (Case No. 05-1505), the Respondents have similarly stated that these individuals are not detained as "enemy combatants" pursuant to the Military Order, but rather pursuant to the President's general authority as Commander-in-Chief. See Reply in Support of Motion for Order to Show Cause, filed Sept. 22, 2005, at p. 12, n. 14. Yet, only a few weeks later, the Respondents charged Shafiiq, a/k/a Sufyian Barhoumi, and alleged that jurisdiction for the charge "is based on the President's determination of July 6, 2004 that Sufyian Barhoumi is subject to his Military Order of November 13, 2001."

We are unclear how Shafiiq could have designated by a presidential determination as of July 6, 2004 that he was subject to the Military Order, yet described as not so subject in September 2005.

Can you please tell us whether each of the following are "designated" under the Military Order or not:
Motai Saib
Nabil
Shafiiq, a/k/a Sufyian Barhoumi
Abbar Sufian al Hawary
Dr. Abu Muhammed, a/k/a Fethi Boucetta

Please also provide whatever documentation there is available that describes the process by which certain detainees are "designated" or not pursuant to the Military Order.

We would appreciate your consideration in responding to this request.

**Anne Castle**
**(303) 295-8229**
**(303) 975-5435 fax**

HOLLAND&HART

**555 17th Street, Suite 3200**
**Denver, CO 80202**

CONFIDENTIALITY NOTICE: This message is confidential and may be privileged. If you believe that this email has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

Exhibit A

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| v. | ) | |
| SUFYIAN BARHOUMI<br>a/k/a Abu Obaida<br>a/k/a Ubaydah Al Jaza'iri<br>a/k/a Shafiq | )<br>)<br>)<br>)<br>)<br>) | **CHARGE:**<br>**CONSPIRACY** |

## JURISDICTION

1. Jurisdiction for this Military Commission is based on the President's determination of July 6, 2004 that Sufyian Barhoumi (a/k/a Abu Obaida a/k/a/ Ubaydah Al Jaza'iri a/k/a/ Shafiq hereinafter "Barhoumi") is subject to his Military Order of November 13, 2001.

2. The charged conduct alleged against Barhoumi is triable by a military commission.

## GENERAL ALLEGATIONS

3. Al Qaida ("the Base"), was founded by Usama bin Laden and others in or about 1989 for the purpose of opposing certain governments and officials with force and violence.

4. Usama bin Laden is recognized as the *emir* (prince or leader) of al Qaida.

5. A purpose or goal of al Qaida, as stated by Usama bin Laden and other al Qaida leaders, is to support violent attacks against property and nationals (both military and civilian) of the United States and other countries for the purpose of, *inter alia*, forcing the United States to withdraw its forces from the Arabian Peninsula and in retaliation for U.S. support of Israel.

6. Al Qaida operations and activities are directed by a *shura* (consultation) council composed of committees, including: political committee; military committee; security committee; finance committee; media committee; and religious/legal committee.

7. Between 1989 and 2001, al Qaida established training camps, guest houses, and business operations in Afghanistan, Pakistan, and other countries for the purpose of training and supporting violent attacks against property and nationals (both military and civilian) of the United States and other countries.

8. In 1992 and 1993, al Qaida supported violent opposition of US. property and nationals by, among other things, transporting personnel, weapons, explosives, and ammunition to Yemen, Saudi Arabia, Somalia, and other countries.

Exhibit B

9. In August 1996, Usama bin Laden issued a public *"Declaration of Jihad Against the Americans,"* in which he called for the murder of U.S. military personnel serving on the Arabian peninsula.

10. In February 1998, Usama bin Laden, Ayman al Zawahiri, and others, under the banner of "International Islamic Front for Fighting Jews and Crusaders," issued a *fatwa* (purported religious ruling) requiring all Muslims able to do so to kill Americans – whether civilian or military – anywhere they can be found and to "plunder their money."

11. On or about May 29, 1998, Usama bin Laden issued a statement entitled "The Nuclear Bomb of Islam," under the banner of the "International Islamic Front for Fighting Jews and Crusaders," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

12. Since 1989 members and associates of al Qaida, known and unknown, have carried out numerous terrorist attacks, including, but not limited to: the attacks against the American Embassies in Kenya and Tanzania in August 1998; the attack against the *USS COLE* in October 2000; and the attacks on the United States on September 11, 2001.

## CHARGE: CONSPIRACY

13. Sufyian Barhoumi, Jabran Said bin al Qahtani, and Ghassan al Sharbi in the United States, Afghanistan, Pakistan, and other countries, from on or about January 1996 to on or about March 2002, willfully and knowingly joined an enterprise of persons who shared a common criminal purpose and conspired and agreed with Usama bin Laden (a/k/a Abu Abdullah), Saif al Adel, Dr. Ayman al Zawahiri (a/k/a "the Doctor"), Muhammad Atef (a/k/a Abu Hafs al Masri), Zayn al Abidin Muhammad Husayn (a/k/a/ Abu Zubayda, hereinafter "Abu Zubayda"), Binyam Muhammad, Noor al Deen, Akrama al Sudani and other members and associates of the al Qaida organization, known and unknown, to commit the following offenses triable by military commission: attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; destruction of property by an unprivileged belligerent; and terrorism.

14. In furtherance of this enterprise and conspiracy, al Sharbi, Barhoumi, al Qahtani, Abu Zubayda, Binyam Muhammad, Noor al Deen, Akrama al Sudani, and other members or associates of al Qaida committed the following overt acts:

    a. In 1998 Barhoumi, an Algerian citizen, attended the electronics and explosives course at Khalden Camp in Afghanistan, an al Qaida-affiliated training camp, where he received training in constructing and dismantling electronically-controlled explosives.

2

b. After completing his training, Barhoumi became an explosives trainer for al Qaida, training members of al Qaida on electronically-controlled explosives at remote locations.

c. In or about August 2000, al Sharbi, a Saudi citizen and Electrical engineering graduate of Embry Riddle University, in Prescott, Arizona, departed the United States in search of terrorist training in Afghanistan.

d. In July 2001, Muhammad Atef (a/k/a/ Abu Hafs al Masri), the head of al Qaida's military committee and al Qaida's military commander, wrote a letter to Abu Muhammad, the *emir* of al Qaida's al Farouq Camp, asking him to select two "brothers" from the camp to receive electronically-controlled explosives training in Pakistan, for the purpose of establishing a new and independent section of the military committee.

e. In July 2001, al Sharbi attended the al Qaida-run al Farouq training camp, where he was first introduced to Usama bin Laden. At al Farouq, al Sharbi's training included, *inter alia*, physical training, military tactics, weapons instruction, and firing on a variety of individual and crew-served weapons.

f. During July and August 2001, al Sharbi stood watch with loaded weapons at al Farouq at times when Usama bin Laden visited the camp.

g. From July 2001 to September 13, 2001, al Sharbi provided English translation for another camp attendee's military training at al Farouq, to include translating the attendee's personal *bayat* ("oath of allegiance") to Usama bin Laden.

h. On or about September 13, 2001, anticipating a military response to al Qaida's attacks on the United States of September 11, 2001, al Sharbi and the remaining trainees were ordered to evacuate al Farouq. Al Sharbi and others fled the camp and were told to fire warning shots in the air if they saw American missiles approaching.

i. Shortly after the September 11 2001 attacks on the United States, al Qahtani, a Saudi citizen and Electrical engineering graduate of King Saud University in Saudi Arabia, left Saudi Arabia with the intent to fight against the Northern Alliance and American Forces, whom he expected would soon be fighting in Afghanistan.

j. In October 2001, al Qahtani attended a newly established terrorist training camp north of Kabul, where he received physical conditioning, and training in the PK Machine gun and AK-47 assault rifle.

3

k. Between late December 2001 and the end of February 2002, Abu Zubayda, a high-ranking al Qaida recruiter and operational planner, assisted in moving al Sharbi, al Qahtani and Binyam Muhammad from Birmel, Afghanistan to a guest house in Faisalabad, Pakistan where they would obtain further training.

l. By early March 2002, Abu Zubayda, Barhoumi, al Sharbi, al Qahtani, and Binyam Muhammad had all arrived at the guest house in Faisalabad, Pakistan. Barhoumi was to train al Sharbi, al Qahtani and Binyam Muhammad in building small, hand-held remote-detonation devices for explosives that would later be used in Afghanistan against United States forces.

m. In March 2002, after Barhoumi, al Sharbi and al Qahtani had all arrived at the guest house, Abu Zubayda provided approximately $1,000 U.S. Dollars for the purchase of components to be used for training al Sharbi and al Qahtani in making remote-detonation devices.

n. Shortly after receiving the money for the components, Barhoumi, Noor al Deen and other individuals staying at the house went into downtown Faisalabad with a five page list of electrical equipment and devices for purchase which included, *inter alia*, electrical resistors, plastic resistors, light bulbs for circuit board lights, plastic and ceramic diodes, circuit testing boards, an ohmmeter, watches, soldering wire, soldering guns, wire and coil, six cell phones of a specified model, transformers and an electronics manual.

o. After purchasing the necessary components, al Qahtani and al Sharbi received training from Barhoumi on how to build hand-held remote-detonation devices for explosives while at the guest house.

p. During March 2002, after his initial training, al Qahtani was given the mission of constructing as many circuit boards as possible with the intent to ship them to Afghanistan to be used as timing devices in bombs.

q. After their training was completed and a sufficient number of circuit boards were built, Abu Zubayda had directed that al Qahtani and al Sharbi were to return to Afghanistan in order to use, and to train others to construct remote-control devices to detonate car bombs against United States forces.

r. During March 2002 al Qahtani wrote two instructional manuals on assembling circuit boards that could be used as timing devices for bombs and other improvised explosive devices.

15. On March 28, 2002, Barhoumi, al Sharbi, al Qahtani, Abu Zubayda and others were captured in a safe house in Faisalabad after authorities raided the home.