**APPROVED FOR PUBLIC FILING BY CSO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                    )
**MOTAI SAIB**, *et al.*,            )
                                    )
    **Petitioner,**    )
                                    )
    *v.*              )    **05-CV-1353 (RMC)**
                                    )
**GEORGE W. BUSH**, *et al.*,        )
                                    )
    **Respondents.**   )
———————————————————————— )

### PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES
### RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS
### AND REQUEST FOR EXPEDITED BRIEFING

    Petitioner Motai Saib (a/k/a Sayab, Mutij Sadiz Ahmad) through his counsel, Holland &

Hart LLP, respectfully submits his Opposition to Respondents' Motion for Procedures Related to

Review of Certain Detainee Materials and Request for Expedited Briefing. Despite the fact that

the Protective Order was entered in this case on August 1, 2005, which requires Respondents to

permit Petitioner's counsel to meet with Petitioner, Respondents have refused to do so. Because

Respondents' Motion relates to the Protective Order entered in this case, Petitioner believes that

it is proper for this Court to consider the Motion, *even though* the Court stayed this case on

January 27, 2006. It is significant, however, that Respondents have taken a contrary position

with respect to motions filed by Petitioner that relate to the Protective Order. On May 26, 2006,

Petitioner filed a Motion to Enforce Protective Order and for Order Compelling Counsel Access

(hereinafter, "Motion to Enforce Protective Order"), Docket No. 26. Respondents failed to

respond to Petitioner's Motion to Enforce Protective Order, stating instead that no response was

necessary because of the Court's stay.  *See* Resp'ts.' Notice Re. Pet'r's Mot. to Enforce

Protective Order and for Order Compelling Counsel Access, at 1, Docket No. 29.

Respondents cannot have it both ways.  Either both Respondents' current motion **and**

Petitioner's Motion to Enforce Protective Order should be considered by the Court,[1] or neither

motion should be considered.  Pursuant to the Court's inherent authority to enforce its own

orders, both motions are properly before the Court regardless of the stay entered in this case.

Petitioner is therefore responding to the merits of Respondents' Motion so that these urgent and

pressing matters may be ruled on by the Court.

Respondents' motion should be denied.  The materials in question are privileged

attorney-client communications.  As a matter of fundamental principle, and by specific order of

this Court, those communications are to be secure against seizure and review by the government.

The government's seizure and review of those communications, without prior approval by the

Court and notice to counsel, was illegal.  The government's failure to disclose its actions to the

Court and counsel until nearly a month after the fact is inexcusable.  In the name of investigating

three prisoner deaths, the government has invaded a fundamental privilege and shattered any

confidence the prisoners might still have had that their communications with their counsel would

be safe from the government's prying eyes.  The American Bar Association has called for an

investigation of the military's massive breach of the privilege.[2]

---

[1]    Pursuant to the Calendar and Case Management Committee's Order dated November 2, 2005, Petitioner's Motion to Enforce Protective Order ought to be referred to Magistrate Judge Alan Kay under LCvR72.2(a) because it involves interpretation and construction of the Protective Order entered in this case.

[2]    *See* Letter dated July 12, 2006, from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy.  (Attached as Exhibit A.)

The stakes are too high for the Court simply to accept the factual assertions that form the basis of the government's instant motion.  The government claims that the privileged communications were seized and examined in the course of an investigation into the suicide deaths of three prisoners.  But without independent verification, the Court cannot be certain that the prisoner deaths *were* suicides.  The government claims that the contents of privileged communications initially seized and reviewed supported its wholesale seizure and review of all privileged communications; but, without examining the communications, the Court cannot be certain what they contained.

Petitioner, who still has not been allowed access to his counsel, has no way of independently investigating the government's allegations.  At present, there is no basis for alleging, and Petitioner does not allege, that the prisoner deaths were not suicides, or that the government is concealing any wrongdoing.  But in view of the privilege issue, the Court cannot afford simply to take the government at its word.  Under these circumstances, the Court should impound the seized communications until it can decide whether further review of any of the communications is to be allowed.  That decision should be made only after Petitioner has been given the opportunity to explore the government's allegations.  If the Court decides to allow any further review, the government should not be allowed to use such review as a fishing expedition. The review should be conducted in the first instance by a magistrate judge or a special master without the involvement of the military or the Department of Justice.

**ARGUMENT**[3]

**A. The Government Has Wrongfully Seized Petitioner's Legal Papers Without Prior Approval by the Court and Notice to Counsel.**

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells.[4] The military reported the prisoners' deaths as suicides.[5]

In his news conference announcing the prisoners' deaths, Navy Rear Adm. Harry B. Harris, the commander of Joint Task Force–Guantánamo, denounced the deaths as an act of warfare: "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."[6] Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths "a good PR move."[7]

Although the military reported the deaths as suicides, Admiral Harris requested an "investigation" by the Naval Criminal Investigative Service (NCIS) to establish the "official cause and manner of death."[8] Now, nearly a month later, the government has disclosed that, between June 10 and June 18, as part of the purported "investigation," NCIS seized and

---

[3]     The government argues in a footnote to its motion that the Detainee Treatment Act divested the Court of jurisdiction over all of the Guantánamo habeas cases. (Mot. at 2 n.3.) The Supreme Court, however, has held that "§ 1005(e)(1) does not strip federal courts' jurisdiction over cases pending on the date of the DTA's enactment." *Hamdan v. Rumsfeld*, slip op. 20 n.15. By its filing of the instant motion, the government implicitly acknowledges the Court's continuing jurisdiction.

[4]     Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html.

[5]     *Id.*

[6]     *Id.*

[7]     Peter Graff, *U.S. Rows Back From Guantanamo Suicide Comments*, June 12, 2006 (Reuters), *available at* http://www.cageprisoners.com/articles.php?id=14438.

[8]     Reuters, *Three Guantanamo Detainees Die, US Army*, June 11, 2006. *available at* http://www.cageprisoners.com/articles.php?id=14371.

4

examined over half a ton of written communications between Guantánamo prisoners and their lawyers. The government claims that it seized these materials because notes found in the cells of the dead prisoners suggested the illicit use of privileged materials for communications among the prisoners; but there is no way to know whether the notes suggested such use of privileged communications or, if they did, whether that was the actual reason for the government's subsequent actions.

The government seized and examined these privileged communications over an eight-day period without court approval or supervision, and without prior notice to the prisoners' counsel, and then waited nearly a month before disclosing its actions to the Court and counsel. The government's seizure and examination of these materials violated not only this Court's orders directing the government to respect the attorney-client privilege but also the Protective Order entered by this Court to ensure the protection of that privilege.

Having belatedly disclosed its illegal seizure and inspection of these privileged materials, the government now asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely. It comes as no surprise that the government sought judicial sanction for its actions only after habeas counsel, informed of the government's actions by their clients, began to seek relief from the Court.[9] The government obviously foresaw a deluge. True to the adage that the best defense is a good offense, it now seeks to preempt further requests for relief by obtaining blanket *post hoc* court approval of its actions.

_____

[9]     Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-00023(RWR) (filed July 5, 2006). The government states that its instant motion is an opposition to the *Abdullah* motion. U.S. Mot. at 1 n.1.

The fact that detainees' legal papers were seized over an eight-day period demonstrates that no exigent circumstances required the government to act without first seeking the approval of the Court and notifying counsel. At the very least, a conference call with counsel and the Court on June 10, the day of the prisoner deaths, could have been arranged.

### B. The Premise Of The Government's Investigation Is Invalid, And The Government's Motion Is Premature.

The Court should not allow the government to examine the seized materials on the premise that the three prisoners' deaths were acts of "warfare" or "a good PR move," or that prisoners may be conspiring to take their own lives. The situation that the prisoners confront – up to five years of confinement on an isolated island without being charged with an offense and without being told on what evidence they are being confined, and no end of their confinement in sight – is sufficient to account for any suicidal acts. The government's attempt to depict the apparent suicides as acts of warfare is a transparent effort to obscure that fact. The government's claims of "plots" and "conspiracies" among the prisoners to end their own lives appear to be merely a pretext for examining privileged communications. The prisoners have long engaged in concerted "self-harm" activity, from hunger strikes to mass hangings, but the government never before sought to exploit that activity to justify seizure and review of privileged communications.

If prisoners take their own lives at Guantanamo, it is undoubtedly because of the hopelessness of their situation and, at least in some instances, the effect of the government's interrogation techniques on their mental health.[10] Breaking the prisoners' spirits and psyches for the purpose of collecting intelligence is Guantanamo's *raison-d'etre*. As Physicians for Human

---

[10]     The description in the text is based on publicly available information, which the undersigned believe to have been reported by reliable sources. Petitioner's counsel have not been given the opportunity to investigate the conditions of Petitioner's confinement.

Rights has stated, "psychological torture [is] central to the interrogation process and reinforced through conditions of confinement."[11]

Prisoners have also been subjected to a variety of other cruel, inhuman, and degrading treatment, including prolonged exposure to extreme heat and cold, religious humiliations (including abuse of the Koran and interference with prayers), threats of execution, threats against family, and prolonged solitary confinement.  The classified 50-day interrogation logs of one "high value" detainee, published last year by *Time*, disclose terrors from which no human could be expected to emerge mentally intact.[12]  Government doctors "assisted in the design of interrogation strategies, including sleep deprivation and other coercive methods tailored to

---

[11]    Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005).  Approved interrogation techniques have included "Removal from social support at Camp Delta"; "Segregation in Navy Brig"; "Isolation in Camp X-Ray"; "Deprivation of light"; "Inducing stress [through] use of female interrogator"; "Up to 20-hour interrogations"; "Removal of all comfort items, including religious items."  Dep't of Defense, *GTMO Interrogation Techniques* (June 22, 2004).  Evidence indicates that the government has also used even more brutal techniques, labeled "Fear Up Harsh," "Sleep Adjustment," and "Futility."  Dep't of Defense, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operation Considerations* at A1-A3 (2003), *available at* http://www.ccr-ny.org/v2/reports/docs/PentagonReportMarch.pdf.

[12]    According to the interrogation logs, authorities held this prisoner in solitary confinement until he became delusional; subjected him to weeks of interrogations lasting 18-20 hours a day; made him bark, growl, and perform dog tricks; forced him to wear a woman's bra and placed a thong on his head; menaced him with dogs; hydrated intravenously and then denied access to a toilet; and, even after his heartbeat had slowed to 35 beats per minute and he was placed in a doctor's care, played screaming loud music in his cell to "prevent detainee from sleeping."  The Deputy Assistant Director of the FBI complained to the Pentagon about this treatment after finding this prisoner in his cell "evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end)."  Letter from T.J. Harrington, Dep'y Assist. Dir., FBI Counterterrorism Div., to Maj. Gen. Donald J. Ryder, U.S. Army (July 14, 2004).

detainees' medical conditions.  Medical personnel also coached interrogators on questioning technique."[13]

Predictably, these tactics have caused the mental health of many Guantánamo prisoners to deteriorate.  According to government data, prisoners committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings.[14]  In August 2003, 23 men attempted to hang themselves.[15]  The government chose to describe all but two of these hangings as incidents of "manipulative self-injurious behavior," rather than as suicide attempts.[16]  In 2004, also according to government data, prisoners committed another 110 acts of "manipulative self-injurious behavior," though it did not report how many of these 110 incidents were attempted hangings.[17] Even with its penchant for defining away suicides as "manipulative self-injurious behavior," the government has acknowledged that 29 prisoners have attempted suicide a total of 41 times.

Once other habeas counsel started meeting with their clients and began to recognize the depressive symptoms they had developed, they made repeated requests of the Department of

---

[13]     M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, New Eng. J. Med., Jan. 6, 2005, at 3.  According to the British medical journal *The Lancet*, "medical records [have been] routinely shared with interrogators in clear breach of confidentiality and with the knowledge that such information can be misused[,] despite objections by the medical team of the International Committee of the Red Cross." Editorial, *How Complicit are Doctors in Abuses of Detainees?*, The Lancet, Aug. 21, 2004, at 637; *see also* Jane Mayer, *The Experiment*, New Yorker, July 11 & 18, 2005, *available at* http://www.cageprisoners.com/downloads/Mayer.pdf. The American Medical Association ("AMA") and American Psychiatric Association ("APA") have now adopted ethical guidelines that limit participation in interrogation.  *See* AMA, *New AMA Ethical Policy Opposes Direct Physician Participation in Interrogation*, June 12, 2006, *available at* http://www.ama-assn.org/ama/pub/category/16446.html; APA, *APA Statement on Psychiatric Practices at Guantanamo Bay*, June 27, 2005, *available at* http://www.psych.org/news_room/ press_releases/05-40psychpracticeguantanamo.pdf.

[14]     *See* Mark Denbeaux, *Report:  The Guantánamo Detainees During Detention* (July 10, 2006), at 6 (Attached as Exhibit B).

[15]     *Id.*

[16]     *Id.* at 14.

[17]     *See id.* at 6.

Justice to bring outside doctors to the prison to perform independent medical examinations of their clients. All such requests, including requests for the release of their clients' medical records, were refused.

The tragic results were predictable. Last fall, counsel for Jumah al Dossari found his client hanging from the wire meshing of an interview cell, his wrist slashed and a pool of blood gathering under his body. Previously, Mr. Dossari's counsel had sought an injunction requiring, among other things, access to his client's medical records. The government opposed this motion, claiming that the "the Guantánamo medical staff provide appropriate medical and mental health services to all detainees through a thorough, coordinated team approach, based on individualized treatment plans that account for each patient's conditions and circumstances."[18]

On May 18, 2006, four more prisoners reportedly attempted suicide by overdosing on medicines they had hoarded, but in a statement released the following day, Commander Harris stated that only two of these efforts were counted as "suicide attempts," apparently because only two prisoners lost consciousness due to their attempts.[19] Two others complained of dizziness and nausea, one claiming that he had attempted suicide but did not have enough pills. These latter two received a medical and psychiatric evaluation, but Commander Harris called these prisoners "attention-seeking sympathizers who were not trying to actually commit suicide."[20]

---

[18]    Gov. Opp'n to Mot. for TRO & Prelim. Injunction, *Almurbati v. Bush*, No. 04-1227 (RBW) (filed Nov. 16, 2005) at 10.

[19]    Kathleen T. Rehm, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006, *available at* http://www.defenselink.mil/news/May2006/20060519_5177.html.

[20]    Dep't of Defense, *Statement on Suicide Attempts at Guantanamo*, May 19, 2006, *available at* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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%20-%201%20-%20Press%20briefing.pdf.

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion occurred. In light of the history, purpose, and nature of Guantánamo, it is impossible to support the government's assertion that the deaths were acts of belligerence, rather than of despair. At the very least, the government must demonstrate to the Court a factual basis to support its assertion that these deaths *were* suicides before it engages in the wholesale seizure of privileged papers as part of an investigation of a suicide "plot" or "conspiracy."

**C.  The Government Has No Authority To Seize Petitioner's Legal Papers.**

This Court has ruled that detainees held at Guantánamo have a right to representation by and access to counsel. It has recognized the privilege that applies to communications between the detainees and their lawyers, and it has gone to great lengths to protect that privilege by creating access procedures protecting the confidentiality of attorney-client communications.

Nonetheless, the government committed a massive breach of the privilege and violated the court-ordered procedures in this case. Now the government asks the Court to condone an even more significant breach of the privilege by permitting it to review further the over half-ton of legal materials that it has seized. This Court should not approve the request. At a minimum, the Court should not allow further review except by a magistrate or special master, and it should not allow review absent individualized showings by the government that the seizure and review of the materials **as to each detainee** is justified.

**1.  The Government Has Long Sought To Prevent the Guantánamo Prisoners From Having the Assistance of Counsel.**

The Court should consider the government's recent actions, and its instant motion, in light of its fierce five-year effort to undermine that relationship. Most of the prisoners at Guantánamo have been held there for nearly five years. Four-and-a-half years ago, when the first next-friend habeas petitions were filed on behalf of prisoners, the government responded by

asserting that the prisoners had no right to seek relief in federal court and no rights for a federal court to enforce. While these issues were being litigated, the government denied the prisoners access to counsel.

In 2004, the Supreme Court rejected "the proposition of Guantánamo Bay as a legal black hole."[21] Unfazed, the government insisted that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit."[22] Judges of this Court "flatly rejected" the government's position and its effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees."[23]

Once counsel began to meet with their clients, the government immediately undertook to undermine the attorney-client relationship. Interrogators fueled mistrust of the lawyers among the prisoners and punished prisoners for meeting with lawyers. For instance, interrogators told prisoners that their lawyers were spies. Interrogators asked other prisoners, "did you know your lawyers are Jews?"[24] and warned prisoners that they would never be released if they retained counsel. Immediately after they met with their lawyers for the first or second time, several detainees were forced to wear immodest clothing, subjected to extreme temperatures, or prohibited from praying. Several detainees have had their legal papers searched.

---

[21]    *Adem v. Bush*, 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush*, 542 U.S. 466 (2004)).

[22]    *Id.* at 12.

[23]    *Id.* at 11–12.

[24]    Frank Davies, U.S. Interrogators Accused of Trying to Divide Detainees, Attorneys (Knight Ridder), May 13, 2005, available at http://www.commondreams.org/headlines05/0513-04.htm.

### 2. Petitioner's Attorney-Client Materials Cannot Be Seized And Reviewed Without An Individualized Showing Of Probable Cause.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[25] Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[26] As this Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[27]

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[28] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[29] Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably

---

[25]    *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[26]    *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[27]    *Al Odah*, 346 F. Supp. 2d at 10.

[28]    *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[29]    *Bach*, 504 F.2d at 1102.

obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[30]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts…. [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[31] The government's vague allegations of notes found in a deceased's cell written by another prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* detainees. Seizing legal papers interferes with a detainee's access to courts and chills the giving, receiving, and continued possession of communications from attorney to client, particularly when seized without notice to the detainees' attorneys or the court.

This Court has recognized that Petitioner – who has not been tried and who seeks the opportunity through his counsel to challenge the basis of his detention – has a right to counsel and is entitled to a confidential relationship with his counsel. Over the government's objections, "[t]he Court [found] that Petitioners are entitled to be represented by counsel."[32] Thus, "the

---

[30]    *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

[31]    *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

[32]    *Al Odah*, 346 F. Supp. 2d at 5.

Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[33] Yet the government has decided, in the teeth of this decision, "to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communication between them."[34]

To give meaning to the attorney-client privilege in this context, the Court implemented Access Procedures which created avenues of confidential communication between detainees and their attorneys by laying the ground rules for in-person meetings, and for written communication between these parties. The government sought the ability to monitor these communications, but that request was squarely rejected by the Court.

The government's actions violated the terms of the Protective Order and accompanying Access Procedures. The government does not attempt to justify its actions under the Protective Order, but rather admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege."[35] The government's unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order. Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise

---

[33]    *Id.*

[34]    *Id.*

[35]    (Mot. at 9.)

privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[36] Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.[37]

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[38]  Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[39]

### 3.  The Government Has Made No Such Individualized Showing.

The government has presented no specific evidence that Petitioner has misused his attorney-client materials.  Indeed, the government does not even purport to do so.  Four or five

---

[36]     *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[37]     *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

[38]     *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

[39]     *Zolin*, 491 U.S. at 572 (quotations and citations omitted).

documents seized from just a few prisoners cannot justify seizing over half-a-ton of privileged materials from hundreds of prisoners.

These documents, moreover, offer little support for the government's position that attorney-client materials are being misused – let alone specific evidence that Petitioner has misused such materials. The initial documents cited by the government were found either in the possession of one of the deceased or were written by one of the deceased. And the additional documents are telling in what they reveal – not a single inappropriate document was found in an attorney-client envelope.

First, the document labeled "FOUO" is a red herring. "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so-labeled are not necessarily sensitive in any manner. "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] …."[40] The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[41] and in fact "is, by definition, unclassified."[42] The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents.

---

[40]     DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[41]     *Id.* 5400.7-R: C4.1.1.

[42]     *Id.* AP3.2.2.3.2.

Second, the document that is marked with a crossed-out "SECRET" stamp is surely *not* a classified document and therefore should be of no concern to NCIS investigators.  (The government, of course, has failed to provide counsel with copies of the documents it relies upon for the instant motion, so counsel can only make an educated guess about the nature of the formerly "SECRET" document.)  Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified and that – whether by request of counsel or the media, or *sua sponte* by the government – the document was declassified and marked accordingly.  It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it.  The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents. The government's intimation that the document may *really* be a classified document that habeas counsel smuggled out of the secure facility, doctored, and sent on to one of their clients borders on slander.

Third, the so-called "knot-tying" document found by the government is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder.  (Again, counsel have not seen the document and have no way even to know whether the government's characterization of this document is fair.)  The document therefore appears to have no relevance to the instant motion, which after all seeks review only of privileged items that have been confiscated by government agents.

Fourth, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the prisoners.  The piece of paper was discovered in the mesh of the cell of one of the deceased, not

17

secreted in the privilege folder of any of the prisoners.  If the deceased were seeking to keep this

document from the prying eyes of the prison guards by disguising it as a privileged document,

why did he place in the open where it would inevitably be discovered?  The answer, most

probably, is that the prisoner in fact wanted the note to be discovered and that he drafted it on the

only piece of paper readily available to him.  In all likelihood, the only "abuse" of the privilege

system was one prisoner's agreement to provide the deceased with a piece of paper from his

privilege folder in order to allow him to express his last wishes to his family.

Finally, the government does alert counsel and the Court to a single document that – from

the government's description of it, anyway – likely should not have been in the possession of a

prisoner.  Remarkably, however, the document is an *email from JTF-Guantánamo itself* – a

document that obviously was not provided to a prisoner by counsel, since counsel does not have

access to such documents.  How did this document come into possession of a prisoner?  Counsel

respectfully suggests that the NCIS inquire of JTF-Guantánamo and its staff, rather than take

advantage of JTF-Guantánamo's apparent security breakdown as an excuse to rifle through the

privileged papers of every detainee in the prison.

The government's generalized security concerns are of the type already rejected by the

Court.  The government, when it sought to justify the real-time monitoring and recording of

attorney-client meetings, claimed that the prisoners would use meetings with counsel "to further

terrorist operations or otherwise disclose information that will cause immediate and substantial

harm to national security."[43]  The Court rejected the government's claims, finding them "thinly

supported."  As for the government's speculation that detainees' counsel are improperly sharing

---

[43]     *Al Odah*, 346 F.2d at 4 n.4.

classified information with their clients, this Court long ago reminded the government that "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[44]

Little has changed – except for the government's new-found concern with suicide prevention. The government introduced interrogation techniques designed to wear down Petitioner's mental health. It resisted any inquiry into detainees' health – even as it recorded hundreds upon hundreds of suicide attempts. After driving detainees to suicide, the government's concern for the mental health of its captives is impossible to take seriously.

**D.  Even If The Privilege Must Yield, Review Should Be By A Neutral Party Rather Than A Government Filter Team.**

Even if the government has shown sufficient basis to abrogate the attorney-client privilege, the use of a Department of Defense Filter Team is inappropriate here. As confirmed by the government's lack of case citations, courts have shown great reluctance to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[45] Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable

---

[44]    *Al Odah*, 346 F. Supp. 2d at 14.

[45]    *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006). *See, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege"); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

risks to the attorney-client privilege.[46]  Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[47]

To the extent that the government can make a specific, individualized showing that a particular detainee is using his attorney-client materials for improper ends, the Court at most should order that those documents be reviewed *in camera* by a judge, in the presence of habeas counsel and without government lawyers.  This procedure would reduce the appearance of impropriety and relieve detainees of some of their understandable unease over sharing their privileged papers with yet another party who is not their legal representative.  Especially given the government's history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored attorney-client communications,[48] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[49]  Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[50]  Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[51]

---

[46]    *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[47]    *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

[48]    *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[49]    *Stewart*, 2002 WL 1300059, at *8.

[50]    *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[51]    *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

Concerns about the appearance of propriety are especially important here, given the difficulties that counsel expects to encounter in gaining Petitioner's trust once counsel is granted access to our client. Petitioner has "been detained virtually incommunicado for nearly three years without being charged with any crime."[52] Moreover, "Petitioner[] face[s] an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system."[53] Worse, as a result of statements from interrogators and other government personnel, many detainees suspect that their civilian attorneys are simply guards or interrogators in disguise.[54] These suspicions will only intensify when Petitioner learn[s] that his attorney-client materials are being reviewed by lawyers for the military that detains and interrogates them.

Another unacceptable aspect of the government's proposal is its suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation.[55] If the filter team determines that the documents are not privileged, the government proposes, then they will be "returned … to JTF-Guantánamo for appropriate action."[56] Such a review for privilege leaves "the government's fox . . . in charge of

---

[52]     *Al Odah*, 346 F. Supp. 2d at 12.

[53]     *Id.*

[54]     *See*, *e.g.*, Charlie Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, at A1.

[55]     *See* Resps.' Mot. at 11.

[56]     *Id.*

the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privilege.[57]

The government's motion is a patent attempt to chill attorney-client communications. In it, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system."[58] This unfounded assertion is a veiled threat to habeas counsel, designed to deter them from communicating effectively with their clients. Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited "from sharing … certain types of materials with detainees … [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[59] Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, they have all been deemed not to be a security risk by the FBI, and they are all officers of the Court. There is no warrant for a new team of Department of Defense lawyers to begin scouring their privileged communications in order to uncover an imagined, nefarious plot to assist their clients in committing suicide.

**E. This Court Should Impound The Materials Confiscated By The Government Pending Disposition Of The Motion.**

The government cannot be trusted to maintain possession of the attorney-client communications that it has confiscated from Petitioner. If this court does not order the immediate return of the papers to Petitioner, it should either take possession of the documents

---

[57]     *In re Grand Jury Subpoenas*, slip op. at 10.

[58]     Resps.' Mot. at 10.

[59]     *Id*. at 11 n.10.

itself pending resolution of the motion, or else order that the documents be promptly delivered into the possession of counsel for safekeeping.

## CONCLUSION

For the preceding reasons, the government's motion should be denied and Petitioner's legal papers should be ordered returned immediately.

Dated: July 21, 2006

Respectfully submitted,

/s Scott S. Barker
Anne J. Castle (Colorado State Bar #11202)
Scott S. Barker (Colorado State Bar #11177)
J. Triplett Mackintosh (Colorado State Bar #22359)
William E. Murane (Colorado State Bar #2676)
Douglas L. Abbott (Colorado State Bar #18683)
Danielle R. Voorhees (Colorado State Bar #35929)
Hamid M. Khan (Colorado State Bar #34139)
Meghan N. Winokur (Colorado State Bar #35973)
HOLLAND & HART, LLP
555 Seventeenth Street, Ste. 3200
Denver, CO  80202
Telephone:  (303) 295-8000
Facsimile:   (303) 295-8261

Of Counsel
Barbara J. Olshansky (New York State Bar #3635)
CENTER OF CONSTITUTIONAL RIGHTS
666 Broadway
New York, NY  10012
Telephone:  (212) 614-6439

**ATTORNEYS FOR PETITIONER**

## CERTIFICATE OF SERVICE

I certify that on July 21, 2006, I served a copy of the foregoing document to the following as indicated below:

United States Department of Justice *via electronic filing*
Peter D. Keisler
Joseph H. Hunt
Kenneth L. Wainstein
Douglas N. Letter
Vincent M. Garvey
Terry M. Henry
James J. Schwartz
Robert J. Katerberg
Nicholas J. Patterson
Andrew I. Warden
Edward H. White
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 7144
Washington, DC  20530

/s Scott S. Barker
Holland & Hart LLP

3580265_1.DOC