# REPORT

## THE GUANTÁNAMO DETAINEES DURING DETENTION
Data from Department of Defense Records
10 July 2006

By

Mark Denbeaux
Professor, Seton Hall University School of Law

&

Joshua Denbeaux, Esq.
Denbeaux & Denbeaux

&

David Gratz
John Gregorek
Matthew Darby
Shana Edwards
Shane Hartman
Daniel Mann
Megan Sassaman
Helen Skinner
Seton Hall University School of Law

# PROFILE OF DETAINEES DURING DETENTION

## EXECUTIVE SUMMARY*

The recent deaths by suicide of three detainees at Guantánamo have raised questions about both the conditions under which such individuals are held and their dangerousness. The Government, consistent with Secretary of Defense Rumsfeld's description of the detainees as the "worst of the worst," has uniformly portrayed the detainees as highly dangerous, even in the restrictive environment in which they are confined. Further, the Government has consistently characterized conduct that, on the surface, seemed to be attempts at suicide, as something other, and less serious, than suicide attempts. The recent "success" of the suicide attempts by the three detainees has led the Government to characterize these three suicides, and previous actions of detainees, as acts of "Asymmetrical Warfare."

The Department of Defense has produced official records that provide some opportunity to assess the accuracy of the Government's description of the detainees and the characterization of their conduct, both in terms of how dangerous the detainees are to others and how dangerous the detainees are to themselves. The data does not support the assertion that the detainees are a serious threat to their captors. More importantly, the data does not support the Government's assertion that the detainees are not serious about taking their own lives.

This Report is the first effort to provide a more detailed picture of how the detainees have behaved during their detention at Guantánamo. This Report provides a window into the detainee behavior towards themselves and their guards. This Report is based entirely upon the United States Government's own documents or the Government's own public statements. The data shows, remarkably, that the detainees are comparatively cowed and unthreatening to their guards but pose a substantial danger to themselves.

- The Government has released a list of 759 individuals who have been detained at Guantánamo.

- Government records reflect that detainees committed acts defined by the Government as "manipulative self-injurious behavior" more often than they commit disciplinary violations:
    o Detainees committed 460 acts of "manipulative self-injurious behavior" in 2003 and 2004, an average of one such act every day and a half (one per every 1.59 days.)
    o Detainees committed 499 disciplinary violations over 2 years and eight months, an average of one incident every two days (one per every 1.91 days.)

- There are more "hanging gestures" by detainees than there are physical assaults on guards, based upon 120 "hanging gestures" for 2003 and 95 assaults and 22 attempted assaults for the 2 years and 8 months of reported disciplinary violations.

---

* Co-Authors Mark Denbeaux and Joshua Denbeaux represent two Guantánamo detainees.

1

- - More than 70% of the disciplinary violations, including "assaults," are for relatively trivial offenses, and even the most serious are offensive but not dangerous.
  - The disciplinary reports reveal that the most serious injuries sustained by guards as a result of prisoner misconduct are a handful of cuts and scratches.

- Assuming no recidivism (obviously, an unlikely assumption), at least one third of the detainees have never committed a Disciplinary Violation.

- Nearly half (43%) of the reported Disciplinary Violations were for spitting at staff.

- Almost half of all disciplinary violations (46%) occurred during a 92-day hunger strike that followed allegations of Koran abuse by guards.

- For 736 of the 952 days covered by the Incident Reports, or 77%, the Government has released no report of a disciplinary violation.

- No act of "asymmetrical warfare" (e.g., suicide or hunger strike) is included in any Incident Report.

# THE REPORT

## Introduction

The Government has, at various points, characterized the conduct of the detainees, both in terms of the threat they offer to their guards and the threat they offer to themselves. Analysis of the Government's own data strongly suggest that the former has been greatly over-stated and the latter greatly under-played. While some of the details of the detention are undeveloped because of the limitations of the data the Government has released, the overall picture of a cowed, unthreatening, depressed and suicidal detainee population emerges clearly.

*The Government on Detainee Misconduct*

In any prison, certainly any maximum security prison, disciplinary problems are a certainty, whether because of general despair, mistreatment or, perhaps, because the prisoners are, as Secretary of Defense, Donald Rumsfeld said on CNN, "very vicious, violent extremist people…who have killed people and who will go -- say they'll go right back out and kill Americans again."[1] Brig. General Jay Hood, at the time the Commander of the Joint Task Force Guantánamo spoke of incidents of detainee misconduct, stating "the vast majority of these detainees we are holding are dangerous men, committed to harming Americans. I know this because of what we have learned about these men, and the threats and assaults that they make against the guard forces and interrogators."[2]

General Hood, speaking of incidents of detainee misconduct, stated that, on a typical day or week, "it is not unusual for guards walking a cell block to have urine, feces or spit hurled at them, to have their ethnic or racial background slurred or to hear detainees threaten to track them down after being released and kill them and their families."[3]

Rear Admiral Harry B. Harris, who succeeded General Hood in March 2006 and is the current Commander of Joint Task Force Guantánamo, sounded a similar theme in the *Chicago Tribune*, "We also provide adequate clothing, including shoes and uniforms, and the normal range of hygiene items, such as a toothbrush, toothpaste, soap and shampoo. Even so, many detainees have taken advantage of this – crafting killing weapons from toothbrushes and garrotes from food wrappers, for example."[4]

The Government has released "Incident Reports of Disciplinary Violations" (IRDVs), which would necessarily include incidents such as these.[5] An examination of these Incident

---

[1] *Television Interview with Secretary Rumsfeld on CNN's "Larry King Live,"* U.S. Department of Defense Interview On CNN's Larry King Live, Transcript Available at http://www.defenselink.mil/transcripts/2006/tr20060525-13131.html
[2] Donna Miles, *Detainees Treated Humanely as Task Force Supports Terror War*, AMERICAN FORCES PRESS SERVICES, June 29, 2005, *available at* http://www.defenselink.mil/news/Jun2005/20050629_1909.html
[3] *Id.*
[4] Adm. Harry Harris, *Inside Guantánamo Bay*, CHICAGO TRIBUNE, May 17, 2006 at C27.
[5] Incident Reports of Disciplinary Violations released June 2 2006, June 9 2006, June 16 2006, available at the Seton Hall Law School Peter Rodino Library, Newark, NJ.

3

Reports allows a comparison of the two Generals' statements with the actual disciplinary infraction record. An exhaustive review of all Incident Reports of Disciplinary Violations failed to uncover even a single event of a toothbrush being made into a "killing weapon" or a food wrapper becoming a garrote. When compared with the Incident Reports of Disciplinary Violations, Admiral Harris' assertion that detainees regularly craft deadly weapons from hygiene items appears not to be true.

*The Government on Detainee Suicide and Other Threat-to-Self Behavior*

On June 11, 2006, Mani Shaman Turki Al-Habardi Al-Utaybi, Yassar Talal Al-Zahrani, and Ali Abdullah Ahmed all committed suicide at the Guantánamo Bay, Cuba. Rear Admiral Harry B. Harris, Jr.'s immediately proclaimed that that these suicides were "not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo."[6] Other statements also claimed that the deaths "were means and methods for protestation… a good PR move to draw attention."[7]

In the wake of the suicides and these statements, there has been renewed attention to the extent to which the detainees are in fact seeking to "escape" their captives by committing suicide and/or are trying to make political statements by inflicting injury on themselves, even to the point of risking or suffering death. Admiral Harris stated that asymmetric warfare includes suicides and suicide attempts.[8] Asymmetric warfare presumably includes hunger strikes as well.

In approaching this question, the Incident Reports of Disciplinary Violations are of no assistance because the Incident Reports of Disciplinary Violations do not report a single instance of hunger strikes, suicide attempts or similar acts of "asymmetrical warfare." At least some of "incidents" seem to involve conduct that appears similar to or in conjunction with threat-to-self behavior, however this Report must take the Government data as it exists.

In any event, regarding threat-to-self behavior, the Report draws not from the Incident Reports of Disciplinary Violations, which are silent on the topic, but from press releases and other public statements made by government officials.

This Report uses the awkward term "threat-to-self" because the Government has created an unusual lexicon to describe conduct that might more intuitively be termed suicide attempts. The Government's lexicon is problematic in a number of respects, but this Report is committed to relying only on the Government's own data, which requires an understanding of the Government's terminology, which follows.

---

[6] Sgt. Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, AMERICAN FORCES INFORMATION SERVICE, June 10, 2006, *available at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html.
[7] Michael Rowland, *US Official Calls Guantanamo Suicides a PR Tactic*, ABC (Australia), June 13, 2006, *transcript available at* http://www.abc.net.au/worldtoday/content/2006/s1661866.htm, *audio available at* http://www.bbc.co.uk/worldservice/ondemand/rams/xin24208___2006.ram
[8] *Prison Boss: No Innocent Men in Guantanamo*, ABC NEWS NIGHTLINE, June 27, 2006, *available at* http://abcnews.go.com/Nightline/story?id=2126364&page=1.

4

**The Government Data**

The data reviewed are the documents prepared by the Government reporting on the disciplinary violations committed by the detainees and the public statements made by governmental officials describing detainee conduct. This report considers only the Government data publicly presented and does not dispute, but rather assumes as true, all of the Government data.

*Government Data for Incident Reports of Disciplinary Violations*

In June 2006, the Government released three documents containing, according to the Department of Defense website, 499 "Incidents of assault, harassment or humiliation of U.S. personnel by detainees at Guantánamo Bay, Cuba."[9] These 499 documents are referred to herein as "Incident Reports of Disciplinary Violations."

The Incidents Reports cover the period between December 19, 2002 and July 27, 2005, a total of 952 days. These are the only official releases documenting detainee misconduct at Guantánamo. For each incident, there is a one-page summary referred to as, "Report and/or Recommendation for Disciplinary Action." The reports serve as summary of the record of a particular violation committed by a detainee. All personal information contained in the summary is redacted. Further, the redaction of names and Internment Serial Numbers (ISNs) makes it impossible to determine which detainees have committed rule violations. Redaction of tracking information also precludes this Report from determining recidivism rates among disruptive prisoners, although the Government does on each Incident Report of Disciplinary Violation have a field tracking recidivism, which is consistently redacted. It is also impossible, with the lack of identifying information, to cross-reference violations with other detainee records to compare disciplinary violations with the summaries of evidence or transcripts available for many detainees.

Information in the Incident Reports of Disciplinary Violations that is not redacted includes the Government's classification of the incident; the date on which the incident occurred; a description of the incident, ostensibly written by the staff member present at the time of the violation; and, for the minority of the incidents, whether the detainee was informed of the Incident Report being filed.

---

[9] "DoD release of records concerning incidents of assault, harassment or humiliation of U.S. personnel by detainees at Guantanamo Bay, Cuba." Found on the Freedom of Information Act Defenselink Page http://www.defenselink.mil/pubs/foi/

*Government Data for Detainee Threat to Self*

The data for detainee self-harm is taken entirely from statements by Government officials to the press.

During the year 2003, detainees committed 350 acts of "self-harm," otherwise known as "manipulative self-injurious behavior." Of these 350, 120 were classified as "hanging gestures."[10]

During the year 2004, detainees committed 110 acts of "manipulative self-injurious behavior." The Government did not report how many of these 110 were "hanging gestures."[11]

Detainees commit "manipulative self-injurious behavior" more frequently than they commit disciplinary violations. The Government reports 460 incidents of "manipulative self-injurious behavior" over two years, or 731 days, for an average of one such behavior every 1.59 days. The Government reports 499 disciplinary violations over two years and eight months, or 952 days, for an average of one such violation every 1.91 days. Detainees committed 460 acts of "manipulative self-injurious behavior" during the years 2003 and 2004.[12]

In August 2003, 23 detainees attempted to hang themselves. The Government classified only two of these as "suicide attempts;" the other 21 were "hanging gestures," a category of "manipulative self-injurious behavior."

The meaning of the terms of the terms "manipulative self-injurious behavior," "self-harm" and "hanging gestures" and the manner in which the Government created them is discussed in the section "Government Characterization of Detainee Self-Harm".

**Analysis of Government Data**

*Analysis of Detainee Misconduct Data*

Due to the manner in which the Incident Reports are released, it is impossible to determine which prisoner committed which disciplinary violation; thus, it is impossible to know whether one detainee, or a relatively few detainees, committed multiple violations. If each detainee each committed one of the reported disciplinary violations, and none committed two (an extremely unlikely scenario), then one-third of the detainees never committed a disciplinary violation of any kind. Taking into account the reports of spitting, and again assuming one violation per detainee, then almost two-thirds of the detainees have either never committed a disciplinary violation or, one time, were reported to have spit at a guard.

---

[10] Paisley Dodds, *Terror Suspects at Guantanamo Attempted Mass Hanging and Strangling Protest in 2003, U.S. Military Reports*, ASSOCIATED PRESS WORLDSTREAM, Jan. 24, 2005, § International News.
[11] *Id.*
[12] *Id.*

Forty-six percent of the disciplinary violations occurred during a three-month hunger strike.

It is a virtual certainty that some detainees committed multiple violations. If that is the case, the number of detainees who have never been cited for any disciplinary violation is much greater than the 33% reported above.

Taken on average, there is one event every other day (an average of one incident every 1.91 days). We know from the Incident Reports of Disciplinary Violations that 46% of the disciplinary violations happened during a three-month period. A more accurate picture of Guantánamo prison life is that there were no disciplinary violations of any kind for 736 of the 952 days for which data is available.

The chart below identifies the number of days on which incidents were reported.



The data suggests that the most likely accurate portrait of the camp is that a minority of the detainees engage in repeated disciplinary violations which are concentrated in a relatively small number of days. Seventy-seven percent of the days at Guantánamo are free of any Incident Reports of Disciplinary Violations and an unknown but certainly large percentage of the detainees have posed no disciplinary problems at all.

*Disciplinary Violation Categories within Incident Reports*

The Government uses 23 classifications for disciplinary violations, although it would appear that there are at least 28 possible classification types, with subtypes available for each violation. The 23 classifications used are not defined, and the categories seem simultaneously over-inclusive and under-inclusive. Additionally, many classifications seem inconsistent with the act described in the Incident Report for that disciplinary violation and with the other Incident Reports reflecting the same or similar misconduct.

Because of these inconsistencies and for more accurate tracking of the conduct underlying the disciplinary violations, this Report uses three classifications of incidents: "throwing" violations, "assault" violations, and regulatory violations.[13] Each category of violation—throwing, assault, and regulatory— includes conduct ranging from serious to the truly petty. Most actions of whatever category are offensive rather than injurious to Guantánamo staff. The most egregious violations are not assault or battery in the classic sense, but incidents

---

[13] When in doubt or in the case of multiple acts, this report applies the most serious classification available.

in which the detainee allegedly threw feces or urine at guards and staff.[14] The four dozen acts of this nature, however revolting, are in sharp contrast to the much more common scenarios—spitting or throwing food. And even these lesser acts are relatively infrequent.

By far the largest percentage of incidents is "throwing" (69%); the next largest category is assaults, including attempted assaults (23%); and the third category, violations of rules and regulations of the camp, accounts for 7% of reported incidents. (See Chart)



An analysis of each of the three categories is necessary to present a clear picture of the actual violations committed by the detainees.

A. Throwing Incidents



Of the 499 total Incident Reports of Disciplinary Violations, there were 346 incidents that this Report classifies as "throwing" violations, comprising 69% of the Incident Reports of Disciplinary Violations. Spitting is by far the most common throwing violation, accounting for 217 of all throwing incidents. Of the 499 total Incident Reports of Disciplinary Violations, fully 43.5% were confined only to spitting. There are 48 instances of throwing feces or urine. There were 43 instances of throwing food or beverages. Finally, there were 38 instances of throwing objects; primarily flip-flops, and occasionally meal trays or stones. (See Chart)

---

[14] The Government data describes such offensive acts 48 times. The Government does not report which detainees committed these acts. It is possible that most of these acts were committed by a handful of very angry detainees, but that possibility cannot be confirmed or denied by the data now available.

These numbers and percentages give only part of the full story of "throwing" violations. The events underlying the classifications of the different types of throwing fail to fully portray the detainee conduct upon which the Incident Report of Disciplinary Violation rests. While there are 48 acts of throwing offensive substances, the vast majority (298 acts) are neither offensive nor serious. Examples of typical throwing acts include:[15]

- On 29 May 2004 …detainee spit at MP for not giving him additional toilet paper.
  *IRDV 218*
- On 06 July 2005 …detainee was sleeping and MP woke detainee up to tell him that his chow was here. Detainee got angry and spit at the MP and made gestures of poking his finger in the MP's eye. No spit/body fluids hit the MP.
  *IRDV 2* (this incident occurred during the hunger strike in 2005)
- On 13 May 05… detainee threw a cup of tea on a block guard and then tried to hit the guard with his flip flop. The block guard shut the bean hole and walked off the tier.
  *IRDV 186* (This incident occurred during the hunger strike)
- On 11 July 2005… detainee assaulted an MP by throwing his shower shoes, a cup of water, and two tubes of toothpaste.
  *IRDV 73* (This incident occurred during the hunger strike)
- Detainee threw a pear core from his food tray slot and struck the Block Guard on the Shoulder.
  *IRDV 3*

B. Assault Violations

Of the reported incidents, 23% were for some form of assault, attempted battery or battery of staff. Assaults can be classified into three types of conduct: (1) striking; (2) grabbing, and (3) attempted striking and or grabbings. "Striking" includes hitting, kicking, head-butting, and stabbing and comprises 56% of the reported assault incidents, or 13% of all Incident Reports of Disciplinary Violations. "Grabbing" includes reported incidents where clothing, whistles, radios, or staff are grabbed, and account for 24.8% of the reported assault incidents. Attempted assaults in which there was no contact account for 19% of the total assault incidents.


Types of Assaults

---

[15] The descriptions are quotations from the Incident Reports written by the MP present at the time of the incident.

9

Assaults by detainees are committed in one of three reported ways: (1) during shackling; (2) through the "bean hole";[16] and (3) in "other" or unspecified contexts. Assaults during shackling, account for 22% of all reported assault incidents. There are 30 assaults that cannot be classified as either shackling or "bean hole" delivery and thus are listed in this report as "other" and comprise 26% of all assault deliveries.



More than half of the assaults occurred through the "bean hole" (52%). The "bean hole" is a small aperture in the cell walls through which the guards pass meals to the detainees. The opening is small—see picture below—with doors that the guards can close.



A Guantánamo Bean Hole[17]

---

[16] To conduct an assault through a bean hole, the detainee would have to crouch or bend down, reach his arm through the bean hole, and then swing or slap at the staff member. While this clearly is a violation subject to disciplinary action, the danger to staff members from this type of assault appears minimal.

[17] Image of bean hole at "Camp 4" published in *The Guardian* June 29, 2006. Available at http://www.guardian.co.uk/guantanamo/story/0,,1809111,00.html?gusrc=rss

10

While there are a handful of cuts and scratches, the Incident Reports of Disciplinary Violations do not reflect a single assault in which any guard or staff member suffered a reported injury requiring medical attention.

Perhaps the most serious incident report of an assault, *IRDV 336*, occurred on 21 December 2004 when a detainee stabbed the MP guard in the hand with his "spork," a plastic eating utensil combining a spoon and a fork. This occurred when the guard attempted to collect utensils after morning chow. After jabbing the MP, the spork fell to the floor, and the bean hole was secured. The detainee came to the cell door window and made a slicing motion across his neck and stated loudly yelling, "I will kill you" and other threats while the MP guards finished collecting the chow.

Perhaps the second most severe acts of assault, *IRDV 288*, occurred on 4 April 2004 when a detainee assaulted an MP who was unshackling the detainee. The detainee reached through the bean hole with his good hand while being unshackled and grabbed the MP by the neck. The MP pulled away, and the detainee grabbed the front of his BDU jacket and T-shirt ripping buttons off the uniform and tearing the shirt. Medical care was not needed.

The assaults can generally be divided into two categories: those in which the detainee resists being shackled and all of the others. The more common examples of assaults were unrelated to shackling. They were also the least threatening:

- On 25 Jun 2004 at approx 0720 the detainee refused to give up the cup in his cell, then proceeded to grab the MP's arm and spit on the MP. During a random cell search he was found to have one orange and 2 MRE wrappers.
  *IRDV 309*
- On 05 May 2005 at 2105 Detainee redacted grabbed the MP's arm while he was handing out linen
  *IRDV 113*
- Detainee…grabbed the block NCO's whistle on 20 1310R May 04
  *IRDV 292*
- On 6 June 2004 at approx 1305 detainee… assaulted an MP by grabbing his arm while he was taking up the lunch plates. The MP pulled his arm out from the bean hole and closed it
  *IRDV 311*
- On 24 June 2005 detainee swung his flip flop at MP three times hitting the MP once on the brim of his cover and twice on the left side of his face because [detainee] believed the MP did not bring him a pear and some salt during the dinner meal.
  *IRDV 201*
- On 15 Jun 05 detainee grabbed the block guard's arm while the guard was retrieving the lunch tray and immediately released it. The bean hole was also immediately closed with no further issues. The detainee was upset because he wanted to talk to the Block NOCO about getting some water. While conducting linen exchange detainee grabbed the hands of the female MP through the bean hole and would not let go. Detainee let go of MP's hands after being told four times and MP pulled away
  *IRDV 211*

11

- On 24 June 2004 at approx 0630 detainee in cell [ISN redacted] reached through bean hole swung his hand towards MP and grabbed MP's whistle. Detainee refused to give back whistle until SOG arrived
    *IRDV 326*

    Examples of assaults when being shackled:

- During the Force Cell Extraction of Detainee…for refusing Intel reservation, the Detainee resisted the IRF team as they entered…. The detainee continued to resist during the shackling procedures of the move. No injuries were received by the Guards or the Detainee
    *IRDV 404*
- On 15 Jun 05 at approximately 0907 detainee… hit [redacted] in the stomach and [redacted] in the hand while they were attempting to shackle him in the shower
    *IRDV 200*
- On 26 July 2005 at 1515 Detainee… spit on the block guard… while he was being handcuffed and said fuck you 3 times. As [redacted] was being escorted out of the shower he pushed the shower door into the block guards hitting [redacted] with the door
    *IRDV 387*

C.   Regulatory Violations

There were 36 incidents that this Report classifies as "regulatory" violations. These comprise 7% of the total Incident Reports for Disciplinary Violations. Violations of rules and regulations appear to be in almost all instances petty. Some examples follow:

- On 20 June 05 detainee did in fact communicate several threats. Detainee requested to be moved to isolation, Camp Five, or Camp Echo, due to air conditioned boundaries in these locations. Detainee was informed that his reason for Camp Four removal wasn't a valid one. Detainee stated that we (JDOG Staff) had one week to move him or he would grab an MP's arm and break it. Redacted asked detainee why would he do this because MPs had done nothing wrong to him. Detainee replied "You're right; bring me [Redacted] and I will break his arm or spit on him." Camp IV OIC spoke with detainee concerning his comments. Detainee stated that he is angry at America for holding him there and no one wants to help him. Detainee stated that he wants to go home. *I think he is acting out in frustration. No further action required.*
    *IRDV 41* (emphasis added)

- On 04 Feb 2005 at 0835 Detainee was cross block talking with [Redacted]
    *IRDV 345*

- On 16 Jan 05 at 1325 hrs detainee was in possession of 6 different pieces of white and orange string of varying length
    *IRDV 347*

12

*Government Characterization of Detainee Self-Harm*

In trying to work with Government data on detainee self-harm, the threshold problem is terminological since the Government employs categories that are neither intuitively obvious nor defined in terms of objective criteria. For example, from August 18 to August 26, 2003, 23 prisoners attempted to hang themselves.[18] To those not familiar with the Guantánamo lexicon, these actions might have been viewed as suicide attempts. But this would be incorrect, as a recitation of the story reveals.

The Government did not report the mass hanging to the public until January 2005, when a Guantánamo Naval Hospital administrator, Capt. John S. Edmundson,[19] speaking to an L.A. Times reporter, casually referred to "the mass hanging incident."[20] The Government immediately denied that the event was a mass suicide attempt,[21] but rather described it as "a coordinated effort to disrupt camp operations."[22] In a statement, Lt. Col. Leon Sumpter explained that only two of the hangings were suicide attempts since only those two resulted in hospitalization combined with psychiatric treatment.[23] The other 21 were described as "hanging gestures," without any explanation of what that term might mean.[24]

In the same statement, the Government revealed that there had been 350 "self harm" incidents -- including 120 "hanging gestures" -- in 2003, and 110 "self harm" incidents in 2004.[25] Therefore, 460 self-harm incidents occurred in the two-year period from 2003 to 2004.

At this point, then, there seemed to be three categories of such conduct: suicide attempts, self harm incidents, and a subdivision of self-harm called hanging gestures. In September 2003, the Government created a new category for detainee actions called "manipulative self-injurious behavior." According to Capt. Edmondson, this category includes acts of self-harm in which "the individual's state of mind is such that they did not sincerely want to end their own life," but instead was intended to obtain release or better treatment. This designation has no apparent basis in psychiatry.[26]

Since the Government refers to the 2003 mass hanging incident both as "manipulative self-injurious behavior" and as a "self harm" incident, the former seems to be simply another

---

[18] Charlie Savage, *Detainees Attempted to Hang Themselves: Scrutiny Widens at Guantánamo*, BOSTON GLOBE, Jan. 25, 2005, at A1.
[19] Cpt. John S. Edmondson is identified as both Cpt. Stephen Edmundson and Cpt. John Edmondson in various news articles.
[20] Carol J. Williams, Editorial, *Covering Gitmo*, L.A. TIMES, June 18, 2006, at M1.
[21] Adam Fresco, *Mass Suicide Bids at Guantánamo Bay Dismissed as Only a Guesture*, TIMES (London), Jan. 25, 2005, *available at* http://www.timesonline.co.uk/article/0,,2-1455415,00.html.
[22] U.P.I., *Guantánamo Detainees Attmpted Hangings*, news release, January 25, 2005.
[23] Paisley Dodds, *Terror Suspects at Guantánamo Attempted Mass Hanging and Strangling Protest in 2003, U.S. Military Reports*, ASSOCIATED PRESS WORLDSTREAM, Jan. 24, 2005, § International News.
[24] *Id.*
[25] *Id.*
[26] David Rose, *Operation Take Away My Freedom: Inside Guantánamo Bay on Trial*, VANITY FAIR, Jan. 2004, at 88.

13

term for the latter; this Report, therefore, treats the two labels as interchangeable.[27] But this leaves the question as to what conduct, other than "hanging gestures," is included in self harm/ manipulative self-injurious behavior. There is evidence that detainees have attempted to slit their wrists on the bars of their cells,[28] and have attempted to overdose on medicine.[29] It is not clear whether the Government would categorize these as suicide attempts or as some kind of manipulative behavior or gesture.

It is possible that the Government also counts other kinds of detainee actions as "manipulative self-injurious behavior." Hunger strikes have been endemic to Guantánamo since its opening.[30] There have also been reports of detainees banging their heads on the walls of their cells.[31]

The category "manipulative self-injurious conduct" appears to have been created in response to the August 2003 mass hangings. Although the Government did not coin the label until September 2003, it then retroactively classified 21 of the 23 hanging attempts as "manipulative self-injurious behavior."[32] At that point, and including the two just added, the suicide attempt count was 32.[33] By June 10, 2006, the count had increased by only 9, to total 41 suicide attempts.[34] Therefore, in the twenty-one month time period between January 2002 and September 2003, the Government reported 32 suicide attempts, and in the 32 month time period between October 2003 and June 2006, the Government reported 9 suicide attempts.

Either the frequency of suicide attempts decreased dramatically since September 2003, or the Government began classifying acts that would have been previously reported as suicide attempts as "manipulative self-injurious behavior." It is not likely that the frequency of suicide attempts decreased. In fact, given the suicide attempts that sparked a detainee riot in May 2006[35] and the three successful suicides in June, the frequency seems to have increased.

---

[27] Dodds, *supra* note 17.
[28] David S. Cloud & Neil A. Lewis, *Prisoners' Ruse Is Inquiry Focus at Guantánamo*, N.Y. TIMES, June 12, 2006, at A1.
[29] Carol J. Williams, *4 Guatánamo Prisoners Attempt Suicide in One Day*, L.A. TIMES, May 19, 2006, at A10.
[30] *See, e.g.*, Paul Harris and Buran Wazir, *Prisoners at Camp X-Ray Go on Hunger Strike*, NEW ZEALAND HERALD, March 1, 2002, at § News; Paul Harris and Burhan Wzir, *Distant Voices Tell of Life for Britons Caged in Camp Delta*, OBSERVER, Nov. 3, 2002, at 3; *Detainees' Hunger Strike in Month 2*, WASHINGTON POST, Sept. 10, at A06; Jim Loney, *Hunger Strike by 52 Terror Suspects*, COURIER MAIL (Queensland, Australia), July 23, 2005, § World at 20; *Hunger Strike Expands*, TORONTO SUN, Dec. 30, 2005, § News at 43; Jane Sutton, *75 Prisoners Join in Hunger Strike at U.S. Base at Guantanamo Bay*, WASHINGTON POST, May 30, 2006.
[31] Stevenson Jacobs, *Guantanamo By Suicide Priosners 'Showed No Sign of Being Depressed'*, INDEPENDENT (London), June 28, 2006, § News at 24.
[32] U.P.I., *Guantánamo Detainees Attempted Hangings*, news release, January 25, 2005; *see also* Savage, *supra* note 12.
[33] *Id.*
[34] James Risen & Tim Golden, *Three Prisoners Commit Suicide at Guantanamo*, N.Y. TIMES, June 11, 2006, § 1, at 1.
[35] Harry B. Harris, Jr., *Statement on Suicide Attempts at Guantanamo*, news release, May 19, 2006, *available at* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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%20-%201%20-%20Press%20briefing.pdf.

Various journalists have asserted that "manipulative self-injurious behavior" is simply a re-classification of suicide attempts.[36] Although the decline in the number of suicide attempts reported and the subjectivity of the categories suggest that this may be correct, the data do not allow a conclusive confirmation of this claim.

The Government appears to use both subjective and objective elements to distinguish "manipulative self-injurious behavior" from a "suicide attempt." The objective element is the extent of the detainee's injury. The subjective element is the Government's interpretation of the detainee's intent. Apparently, if a detainee does not sustain serious injury, his act is not considered a suicide attempt. If a detainee does sustain serious injury, his intent is determined to be either to kill himself or to attain improved treatment or release.

To understand the two factors, it is important to note that the Government's categorization could focus either on objective facts, for example, how serious an injury the detainee inflicted on himself, or on subjective facts, for example, the detainee's perceived state of mind.

The Government states that the difference between a "suicide attempt" and "manipulative self-injurious behavior" is that, in a "suicide attempt," a detainee could die without intervention, whereas in "manipulative self-injurious behavior," a detainee seeks only to gain attention.[37]

The August 2003 hangings illustrate the application of both the objective and the subjective factors. When Capt Edmondson revealed the August 2003 mass hanging, he did so to clarify that the incident was the only time when the 48-bed hospital ward was at or near capacity.[38] The Government reported that only two of the hangings resulted in hospitalization, even though many more detainees filled hospital beds as a result of their hangings. The other 21 were called "hanging gestures," a type of "manipulative self-injurious behavior."[39] Yet the Government reported only two of the attempted hangings that resulted in hospitalization as suicide attempts.[40] The Government could have utilized either test. The Government may have meant that only two detainees required hospitalization and that their injuries mandated more care than the others (the objective factor). Alternatively, the Government may have decided that hospitalization is not the deciding factor in determining the presence of a suicide attempt, and instead considered the detainee's motive in hanging himself (the subjective factor). The hospitalization of so many of the detainees was not a sufficient basis to conclude that any one detainee had attempted suicide.

More recently, on May 18, 2006, at least four detainees engaged in what might have been classified as attempts to commit suicide, resulting in a detainee riot. In a statement released the following day, Rear Admiral Harry B. Harris, Jr. revealed that only two of these efforts were

---

[36] *See, e.g.*, David Rose, *How US Hid the Suicide Secrets of Guantanamo*, GUARDIAN (London), June 18, 2006, § Observer Foreign Pages at 30; Jason Oddy, *Living With the Enemy*, Independent (London), Dec. 7, 2003, § Features at 25.
[37] *Mass Suicide Bids at Guantanamo Bay Dismissed as Only a Gesture*, TIMES (London), Jan. 25, 2005, § Home News, at 6.
[38] Rose, *Operation, supra* note 20.
[39] Dodds, *supra* note 17.
[40] Rose, *Operation, supra* note 20.

counted as "suicide attempts," apparently because only two detainees lost consciousness due to their attempts. Two others complained of dizziness and nausea, one claiming that he had attempted suicide but did not have enough pills. These latter two received a medical and psychiatric evaluation, but Harris called these detainees "attention-seeking sympathizers who were not trying to actually commit suicide."[41] Since this quote is a concise restatement of the definition for "manipulative self-injurious behavior," the latter two detainees were probably classified as having exhibited such behavior, even though they received a psychological and medical examination and one of them claimed that he was trying to kill himself. The Government may have used both factors in making this distinction, as well.

As for subjectivity, the Government defines "manipulative self-injurious behavior" as an insincere effort to end life.[42] Thus, the classification of a given act will depend on the classifier's assessment of the detainee's real purpose in engaging in the self-injurious conduct. Only if the Government concludes that the behavior was "sincere," however, does the act become a suicide attempt. In all other cases, it is classified as merely "manipulative self-injurious behavior," even if the act resulted in injury sufficient to require hospitalization.

Given the sheer number of incidents of "manipulative, self-injurious behavior," combined with the paucity of governmental detail as to why particular actions are classified to be insincere and thus count as such behavior, it is impossible to definitively conclude that the 460 incidents of "manipulative, self-injurious behavior" are, or are not, suicide attempts. To the extent that there is any bias in the system, however, it certainly tilts in terms of under-counting suicide attempts.

This is underscored by the fact that the Government has from the outset recognized the high risk of detainee suicide. One factor in determining whether to transfer a person to Guantánamo Bay was his propensity for self-injury. "'Right from the start, it was known there were individuals capable and willing to harm themselves,' a U.S. military official familiar with the assignment process said. 'One of the reasons they were brought there was because it was thought they would be a harm to themselves.'"[43]

Reflecting that reality, Guantánamo officials have for years taken precautions against detainees committing suicide and prepared for that eventuality. In a Navy e-mail dated August 2003, the month of a mass hanging incident, an officer asked what should be done in the event of a successful suicide.[44] Former Cpt. James Yee served as the Muslim Chaplain at Guantánamo in 2002 and 2003, and in this capacity he helped develop detailed burial protocols.[45] In the summer of 2005, in response to an increased number of hunger strikes, the military again considered procedures in the event of a successful detainee suicide.[46] In February 2006 officials began reciting to detainees passages of the Koran that forbid suicide.[47]

---

[41] Harris, *supra*, note 29, http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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%20-%201%20-%20Press%20briefing.pdf
[42] Rose, O*peration*, *supra* note 20.
[43] Manuel Roig-Franzia, *Guantánamo Was Prepared for Suicide Attempts*, WASHINGTON POST, March 2, 2003, at A07.
[44] Dodds, *supra* note 17.
[45] Savage, *supra* note 12.
[46] Risen & Golden, *supra* note 28.
[47] *Id.*

## Concluding Analysis

The Incident Reports of Disciplinary Violations do not mention detainee acts of "asymmetrical warfare" by any name in the lexicon the Department of Defense has developed to describe self-harm. A system that records an act of spitting or throwing a glass of water by a detainee, however, would be expected to include acts of asymmetrical warfare against the Guantánamo Detention Authorities. This suggests, but does not prove, that the Government did not regard these acts of self-harm as "asymmetrical warfare" until the Government's own public relations concerns were implicated.

The failure to cite suicide attempts and hunger strikes in the Incident Reports of Disciplinary Violations cannot be the result of inadvertence. This is especially true since the times when hunger strikes were taking place and mass hangings were occurring coincided with the greatest cluster of Incident Reports of Disciplinary Violations. (See Timeline)



The 92 days of May, June and July 2005 encompassed a major hunger strike. During that time, 46% of all Incident Reports of Disciplinary Violations occurred. (See Chart) The omission of any reference to the hunger strikes during this period of turmoil of Incident Reports of Disciplinary Violations makes it clear that the camp did not treat such acts as asymmetric warfare at that time.



17

The content of the Incident Reports during the August 18-26, 2003 "mass hanging" attempt by a number of inmates is the starkest example that attempted suicides were not considered to be disciplinary violations. The 13 Incident Reports of events that occurred on August 18, 2003 are most revealing. These 13 Incident Reports of Disciplinary Violations make no mention of any suicide attempts or "mass hangings."

The Incident Reports of Disciplinary Violations of that date describe "block disturbances" and "riots" but no acts of self harm, manipulative self injurious behavior, attempted suicide, or suicide. The 13 reports cites as disciplinary violations 12 instances of detainees throwing water. There exist only two descriptions for the 12 incidents, with duplicate descriptions occurring on the Incident Reports of Disciplinary Violations.

The reports of the events for that day, one at 1220, the other at 1230, as written by the MPs, are as follows:

- On 18 Aug 03 @ 1220 hrs the detainee on [Redacted] block rioted over a complaint of a MP touching a Koran. The riot carried over to Charlie block, and detainee threw water/fluids on the MP guards. Medical was not needed
    *IRDV 521*
- On 18 Aug 03 at approximately 1230 hours, detainee [redacted] was involved in a block disturbance in reaction to an MP accidentally knocking the Koran out of detainee redacted surgical mask while searching the cell. During the disturbance, redacted through (sic.) cups of water on the MP Staff. One MP reported to medical to be decontaminated as she suspected there to be body fluids in the fluid thrown
    *IRDV 520*

The reports make clear that throwing water is recorded as a disciplinary violation yet attempting suicide is not.